# In the United States Court of Federal Claims

No. 09-315 L

(E-Filed:  August 30, 2012)

| | | |
|---|---|---|
| _____ | ) | |
| WHISPELL FOREIGN CARS, | ) | |
| INC., ET AL., | ) | |
| | ) | Fifth Amendment Rails-to-Trails |
| | ) | Takings Claim; Adverse |
| Plaintiffs, | ) | Possession |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

<u>Mark F. Hearne, II</u>, Clayton, MO, for plaintiffs.  <u>Lindsay S.C. Brinton</u> and <u>Meghan S. Largent</u>, Washington, DC, and <u>Debra J. Albin-Riley</u> and <u>Joseph L. Cavinato, III</u>, Los Angeles, CA, of counsel.

<u>Carol L. Draper</u>, Trial Attorney, with whom was <u>Ignacia S. Moreno</u>, Assistant Attorney General, Environment & Natural Resources Division, Natural Resources Section, United States Department of Justice, Washington, DC, for defendant.

## OPINION

HEWITT, Chief Judge

I.      Introduction

        This is a rails-to-trails case involving segments of a rail corridor located in St. Petersburg, Florida.  This opinion addresses whether, based on the absence of a genuine issue of material fact, defendant is entitled to summary judgment that segments of the corridor were adversely possessed by Tampa & Gulf Coast Railroad (individually and/or collectively with its successors, as the context requires, Tampa & Gulf Coast), precluding the takings claims of plaintiffs Jesse and Virginia Abrams (Abrams) and Bama Sea Products, Inc. (Bama Sea).  The court also considers whether plaintiffs' request for reconsideration of a prior opinion should be granted.

Before the court are the United States' Motion for Summary Judgment with Respect to the Abrams and Bama Sea Properties and Memorandum in Support[1] (defendant's Motion or Def.'s Mot.), Docket Number (Dkt. No.) 112, filed November 9, 2011; Plaintiffs' Opposition to the United States' Motion for Summary Judgment with Respect to the Abrams and Bama Sea Products Properties (plaintiffs' Response or Pls.' Resp.), Dkt. No. 153, filed May 30, 2012; and the United States' Reply in Support of Motion for Partial Summary Judgment on the Abrams and Bama Sea Properties (defendant's Reply or Def.'s Reply), Dkt. No. 159, filed July 6, 2012.

II.     Background

    A.     The Trails Act Amendments and the Takings Clause

The National Trails System Act Amendments of 1983 (the Trails Act Amendments), Pub. L. No. 98-11, 97 Stat. 42, to the National Trails System Act, Pub. L. No. 90-543, 82 Stat. 919 (1968) (codified as amended at 16 U.S.C. § 1241 (2006)), authorized the Interstate Commerce Commission to "preserve shrinking rail trackage by converting unused rights-of-way to recreational trails." Preseault v. Interstate Commerce Comm'n (Preseault I), 494 U.S. 1, 5 (1990).[2]  The Trails Act Amendments operate to prevent a railroad from abandoning existing rail tracks, Whispell Foreign Cars, Inc. v. United States, No. 09-315 L, 2012 WL 3591096, at *5-6 (Fed. Cl. Aug. 22, 2012), with the result that a Fifth Amendment taking may occur if a "[notice of interim trail use (NITU)] is issued and state law reversionary interests that would otherwise take effect pursuant to normal abandonment proceedings are forestalled," Caldwell v. United States, 391 F.3d 1226, 1236 (Fed. Cir. 2004).

The United States Court of Appeals for the Federal Circuit has set forth a three-part inquiry to guide the resolution of a plaintiff's takings claim in a rails-to-trails case:

---

[1]   Unless otherwise noted, the court's citations to the United States' Motion for Summary Judgment with Respect to the Abrams and Bama Sea Properties and Memorandum in Support (defendant's Motion or Def.'s Mot.), Docket Number (Dkt. No.) 112, will refer to the page numbers of defendant's Memorandum in Support, which is attached to Defendant's Motion and is contained in the same document.

[2]   A more detailed description of the National Trails System Act Amendments of 1983, Pub. L. No. 98-11, 97 Stat. 42, to the National Trails System Act, Pub. L. No. 90-543, 82 Stat. 919 (1968) (codified as amended at 16 U.S.C. § 1241 (2006)), and their operation may be found in the court's prior opinions.  See, e.g., Whispell Foreign Cars, Inc. v. United States, 100 Fed. Cl. 529, 532-33 (2011); Whispell Foreign Cars, Inc. v. United States, 97 Fed. Cl. 324, 327-28 (2011).

(1) who owned the strips of land involved, specifically did the
Railroad . . . acquire only easements, or did it obtain fee simple estates; (2)
if the Railroad acquired only easements, were the terms of the easements
limited to use for railroad purposes, or did they include future use as public
recreational trails; and (3) even if the grants of the Railroad's easements
were broad enough to encompass recreational trails, had these easements
terminated prior to the alleged taking so that the property owners at that
time held fee simples unencumbered by the easements.

Preseault v. United States (Preseault II), 100 F.3d 1525, 1533 (Fed. Cir. 1996).

Defendant's Motion, and therefore most of the court's opinion, addresses the first
inquiry:  whether or not the railroad acquired fee simple title to properties claimed to be
owned by the Abrams and Bama Sea plaintiffs.  See Def.'s Mot. 1-17.  The opinion also
addresses whether or not, at plaintiffs' request, the court should reconsider its conclusion
in Whispell Foreign Cars, Inc. v. United States (Whispell III), 100 Fed. Cl. 529, 542-45
(2011), that a railroad, by satisfying Florida's requirements for adverse possession, may
obtain fee simple title by adverse possession.

B.     Procedural History

In its first opinion in this case, issued in February 2011, this court ruled that four
conveyances to Tampa & Gulf Coast granted fee simple title to the railroad and, on this
ground, denied the takings claims of thirteen plaintiffs, including Bama Sea.  Whispell
Foreign Cars, Inc. v. United States (Whispell I), 97 Fed. Cl. 324, 326-27 (2011).  With
respect to the takings claim of the Abrams plaintiffs, the court found that a genuine issue
of material fact precluded summary judgment and stated that "the evidence does not
permit the court to determine whether [Tampa & Gulf Coast] held title to the property
adjacent to the property of . . . [the] Abrams."  Id. at 327 n.2.

Five plaintiffs subsequently filed a motion for reconsideration requesting the court
to reconsider its dismissal of their claims.  Whispell Foreign Cars, Inc. v. United States
(Whispell II), 98 Fed. Cl. 532, 533 (2011).  The parties stipulated to the conveyances (or
lack thereof) relevant to each of the five properties, Parties' Joint Stipulation in Resp. to
This Ct.'s June 7, 2011 Order, Dkt. No. 83, at 1-2, and, on reconsideration, most of the
claims dismissed by the court in its February 2011 opinion were unaffected, Whispell III,
100 Fed. Cl. at 535-36.

However, in the court's opinion on reconsideration, the court addressed for the
first time two issues relevant to the claims by plaintiffs Abrams and Bama Sea:  1)
"whether, as a matter of law, a railroad could obtain fee simple title by adverse

3

possession under Florida law," <u>id.</u> at 542, and 2) "whether Tampa & Gulf Coast met the requirements under Florida law for acquiring fee title to the [Abrams and Bama Sea] segment without a recorded conveyance by adverse possession," <u>id.</u> at 545.  The court answered the first question in the affirmative, finding the guidance provided by the Supreme Court of Florida, the District Court of Appeal of Florida for the First District and the United States Court of Appeals for the Fifth Circuit persuasive.  <u>Id.</u> at 542-45 (citing <u>Dunscombe v. Loftin</u>, 154 F.2d 963 (5th Cir. 1946), <u>Seaboard Air Line Ry. Co. v. Atl. Coast Line R. Co.</u>, 158 So. 459 (Fla. 1935) and <u>Tassapoulos v. Seaboard Coastline R.R. Co.</u>, 353 So. 2d 867 (Fla. Dist. Ct. App. 1977)).  The court then found that "[n]either party ha[d] set forth sufficient evidence on the issue of adverse possession" to permit the court to decide whether Tampa & Gulf Coast acquired title to the Abrams and Bama Sea segments by adverse possession.  <u>Id.</u> at 545-46.

Defendant now moves for summary judgment that plaintiffs Abrams and Bama Sea cannot maintain their takings claims because Tampa & Gulf Coast had acquired fee simple title to the relevant segments of the rail corridor by adverse possession.  Def.'s Mot. 1-2.  Plaintiffs oppose defendant's Motion and request that the court reconsider its ruling in <u>Whispell III</u> that a railroad may obtain fee title by adverse possession if it satisfies Florida's adverse possession requirements.  Pls.' Resp. 1-2, 10-13.

III.   Legal Standards

A.   Summary Judgment

Rule 56 of the Rules of the United States Court of Federal Claims (RCFC) provides, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).  The moving party has the initial burden of demonstrating "the absence of any genuine issue of material fact and entitlement to judgment as a matter of law."  <u>Crater Corp. v. Lucent Techs., Inc.</u>, 255 F.3d 1361, 1366 (Fed. Cir. 2001) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986)).[3]  This burden may be discharged

---

[3]  The Rules of the United States Court of Federal Claims (RCFC) generally mirror the Federal Rules of Civil Procedure (FRCP).  <u>See</u> RCFC 56, Rules Committee Note (2008) ("The language of RCFC 56 has been amended to conform to the general restyling of the FRCP."); <u>Flowers v. United States</u>, 75 Fed. Cl. 615, 624 (2007) ("RCFC 56 is patterned on Rule 56 of the [FRCP] and is similar in language and effect."), <u>aff'd</u>, 321 F. App'x 928 (Fed. Cir. 2008); <u>Champagne v. United States</u>, 35 Fed. Cl. 198, 205 n.5 (1996) ("In general, the rules of this court are closely patterned on the [FRCP].  Therefore, precedent under the [FRCP] is relevant to interpreting the rules of this court, including Rule 56."), <u>aff'd</u>, 136 F.3d 1300 (Fed. Cir. 1998); <u>C. Sanchez & Son, Inc. v. United States</u>, 6 F.3d 1539, 1541 n.2 (Fed. Cir. 1993) ("The [RCFC] generally follow the [FRCP].  [RCFC] 56(c) is, in pertinent part, identical to [FRCP] 56(c).").  Therefore, this court relies on cases interpreting FRCP 56 as well as those interpreting RCFC 56.

by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. Once the moving party has met its initial burden, the nonmoving party then bears the burden of coming forward with specific facts showing that there are genuine issues of material fact for trial. See id. at 324; RCFC 56(c)(1).

A fact is material if it "might affect the outcome of the suit." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," that is, when the proper resolution of the issue would require a trial. Id. at 248-50; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp. (Matsushita), 475 U.S. 574, 587 (1986). In considering a motion for summary judgment, the court draws all inferences in favor of the non-moving party. See Matsushita, 475 U.S. at 587; Mann v. United States, 334 F.3d 1048, 1050 (Fed. Cir. 2003) (citing Anderson, 477 U.S. at 255).

B.     Motion for Reconsideration

The standards applicable to reconsideration of non-final decisions are set forth in Rules 54(b) and 59(a) of the RCFC. RCFC 54(b) provides that "any order or other decision . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." RCFC 54(b). RCFC 59(a)(1) provides that

> [t]he court may, on motion, grant a new trial or a motion for reconsideration on all or some of issues . . . as follows:
> (A)     for any reason for which a new trial has heretofore been granted in an action at law in federal court;
> (B)     for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court; or
> (C)     upon the showing of satisfactory evidence, cumulative or otherwise, that any fraud, wrong, or injustice has been done to the United States.

RCFC 59(a)(1)(A)-(C).

The decision to grant a motion for reconsideration lies within the sound discretion of the court. See Yuba Natural Res., Inc. v. United States, 904 F.2d 1577, 1583 (Fed. Cir. 1990). The court must consider such a motion with "exceptional care." Fru-Con Constr. Corp. v. United States (Fru-Con), 44 Fed. Cl. 298, 300 (1999) (internal quotation marks omitted). To prevail on a motion for reconsideration, the movant must point to a manifest error of law or mistake of fact. Franconia Assocs. v. United States, 44 Fed. Cl. 315, 316 (1999), aff'd, 240 F.3d 1358 (Fed. Cir. 2001), rev'd on other grounds, 536 U.S.

129 (2002).  The movant does not persuade the court to grant such motion by merely reasserting arguments which were previously made and were carefully considered by the court.  Principal Mut. Life Ins. Co. v. United States, 29 Fed. Cl. 157, 164 (1993), aff'd, 50 F.3d 1021 (Fed. Cir. 1995).  A motion for reconsideration "'is not intended to give an unhappy litigant an additional chance to sway the court.'"  Fru-Con, 44 Fed. Cl. at 300 (quoting Bishop v. United States, 26 Cl. Ct. 281, 286 (1992)).  Rather, "the movant must show:  (1) that an intervening change in the controlling law has occurred; (2) that previously unavailable evidence is now available; or (3) that the motion is necessary to prevent manifest injustice."  Id. at 301.

IV.    Discussion

    A.    Adverse Possession Without Color of Title

Whether an individual has a compensable private property interest is determined by state law.  See Bd. of Regents of State Colls. v. Roth (Roth), 408 U.S. 564, 577 (1972) ("Property interests, of course, are not created by the Constitution.  Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . .").  The court therefore turns to the law of Florida governing adverse possession, which has remained largely the same over the periods referenced by defendant's argument.  Because the parties have stipulated that no written instrument establishes or could establish title to the contested segments, Whispell III, 100 Fed. Cl. at 541, the court looks particularly at the Florida provisions for adverse possession without color of title.

    1.    Florida's Adverse Possession Requirements

In and between 1914 and 1938, Florida's statute governing adverse possession without color of title provided:

> 1.  To Be Land in Actual Occupation Only.--Where it shall appear that there has been an actual continued occupation for seven years of premises under a claim of title exclusive of any other right, but not founded upon a written instrument, or a judgment or decree, the premises so actually occupied, and no other, shall be deemed to have been held adversely.

> 2.  Definition of Occupation and Possession Required.--For the purpose of constituting an adverse possession by a person claiming title not founded upon a written instrument, judgment or decree, land shall be deemed to have been possessed and occupied in the following cases only:  1.  Where it has been protected by substantial enclosure; or, 2.,  where it has been usually cultivated or improved.

See Fla. Stat. Ann. § 1722 (West 1915); Rev. Gen. Stat. Fla. § 1722 (1920); cf. Edwards v. Hardin Props., Inc., 313 So. 2d 82, 84 n.1 (Fla. Dist. Ct. App. 1975) (explaining that "[b]y ch. 19254 (Laws 1939) (now § 95.18 F.S. 1973), § 2936, Rev.[]Gen.[]Stat. 1920, was amended to require the payment of taxes as a condition precedent to acquiring title by adverse possession without color of title").

In 1939, Florida added two additional requirements for an adverse possession claim to succeed:  that the adverse possession claimant file a "return of [the] property" [4]

---

[4]  Florida law applicable in 1939 required that the adverse possession claimant "make a return of said property by proper legal description to the assessor of the county."  1939 Fla. Laws 496. The "return . . . by proper legal description" was for tax purposes and the claimant was also required to pay the tax that was subsequently assessed.  See Grant v. Strickland, 385 So. 2d 1123, 1129 (Fla. Dist. Ct. App. 1980) (describing the 1939 amendments to the adverse possession statute as "requiring return of property for taxes"); Kerrigan v. Thomas, 281 So. 2d 410, 412 (Fla. Dist. Ct. App. 1973) (describing the return filed by plaintiffs' predecessors in title as "the 'NE 1/4 of NE 1/4 and North 9 1/4  acres of SE 1/4 of the NE 1/4 of North 1/2 of Lot 1, Section 34, Township 4 South, Range 12 East, containing 49 1/4 acres'")  Not until 2012 did the Florida legislature specify more precisely the elements of a "return . . . by proper legal description."  The current statute provides:

A person claiming adverse possession under this section must make a return of the property by providing to the property appraiser a uniform return on a form provided by the Department of Revenue.  The return must include all of the following:

(a) The name and address of the person claiming adverse possession.

(b) The date that the person claiming adverse possession entered into possession of the property.

(c) A full and complete legal description of the property that is subject to the adverse possession claim.

(d) A notarized attestation clause that states:

UNDER PENALTY OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING RETURN AND THAT THE FACTS STATED IN IT ARE TRUE AND CORRECT.

(e) A description of the use of the property by the person claiming adverse possession.

(f) A receipt to be completed by the property appraiser.

with the assessor of the county in which the property is located and pay the taxes due on the property during the alleged period of adverse possession.[5]  1939 Fla. Laws 495-96. Amendments in 1974 reworded the statute but left its substance intact.  See 1974 Fla. Laws 1213; Altman v. Champion Int'l Corp., 611 So. 2d 8, 9 (Fla. Dist. Ct. App. 1992). Subsequent statutory amendments made additional small changes, such as making the statute gender neutral, but again left its substance unchanged.  See, e.g., 1995 Fla. Laws 394.

As Florida courts have explained, an adverse possessor must first actually and exclusively possess or occupy the property, see Downing v. Bird, 100 So. 2d 57, 65 (Fla. 1958), either by protecting it with a substantial enclosure or ensuring that the land has been "usually cultivated or improved," see Baugher v. Boley, 58 So. 980, 982 (Fla. 1912) (internal quotation marks omitted).  Second, this possession or occupation must be

_____

Fla. Stat. Ann. § 95.18(3) (West 2012).

[5]  The revised statute stated:

> 1.  To be Land in Actual Occupation Only.--Where it shall appear that there has been an actual continued occupation for seven years of premises under a claim of title exclusive of any other right, but not founded upon a written instrument, or a judgment or decree, the premises so actually occupied, and no other, shall be deemed to have been held adversely; provided that during the period of seven years aforesaid the person so claiming adverse possession without color of title shall have within a year after entering into possession make a return of said property by proper legal description to the assessor of the county wherein situated and has subsequently, during each year paid all taxes theretofore or thereafter levied and assessed against the same . . . .

> Section 2.  Definition of Occupation and Possession Required.--For the purpose of constituting an adverse possession by a person claiming title not founded upon a written instrument, judgment or decree, land shall be deemed to have been possessed and occupied in the following cases only: 1.  Where it has been protected by substantial enclosure; or 2.  where it has been usually cultivated or improved; 3.  provided however, no such land shall be deemed to have been held adversely under the provisions of sub-divisions 1 and 2 above unless within one year after the entry by such adverse owner, he, she or it has returned the said property by proper legal description to the assessor of the County wherein situated, and has subsequently, during each year paid all taxes theretofore or thereafter levied and assessed against the same . . . .

1939 Fla. Laws 495-96 (emphasis added) (some capitalization omitted).

continuous for the statutorily mandated period of seven years.  <u>Downing</u>, 100 So. 2d at 64.  Third, the possession "must either be with the knowledge of the owner or so open, notorious, and visible that knowledge of the use by and adverse claim of the claimant is imputed to the owner."  <u>Id.</u>  Fourth, the possession must be adverse--non-permissive and inconsistent with the record owner's use and enjoyment of the land, <u>see id.</u>--and under a claim of title, <u>see</u> <u>Goodno v. S. Fla. Farms Co.</u>, 116 So. 23, 25 (Fla. 1928) (stating, in a case in which a claimant took possession of land by mistake, "The true question is whether, <u>when he acquired possession</u>, he believed it to be his own and intended to and did hold it as his own and against all persons"); <u>Liddon v. Hodnett</u>, 22 Fla. 442, 460 (1886); <u>cf.</u> <u>Harrison v. Speer</u>, 114 So. 515, 517 (Fla. 1927) (citing with approval a case in which it was "held that it is admissible, in order to sustain title by adverse possession, to ask a witness whether it was not generally known in the vicinity of the land that defendant's grantor claimed title").

For cases in which adverse possession was alleged to commence after the passage of the 1939 amendments, a claimant was also required to file a return on the land and to pay the taxes assessed on the land.  <u>See</u> <u>Van Meter v. Kelsey</u>, 91 So. 2d 327, 330 (Fla. 1956) (agreeing with the lower court finding that defendants did not prove their claim of adverse possession and noting that "[t]here was no evidence . . . [that] defendants ever returned the land for taxes, or ever paid taxes thereon").

Under Florida law, the elements of adverse possession must be proved by clear and convincing evidence.  <u>See</u> <u>Atl. Coast Line R. Co. v. Seward</u> (<u>Seward</u>), 150 So. 257, 258 (Fla. 1933) ("Where the proof is not clear and positive of adverse possession and occupation for the full statutory period, no title by adverse possession can be adjudged."); <u>Downing</u>, 100 So. 2d at 64 ("[T]he burden is on the claimant to prove that the use or possession is adverse.  This essential element as well as all others must be proved by clear and positive proof, and cannot be established by loose, uncertain testimony . . . ."). The occupation and possession by an adverse possession claimant is "presumed to be in subordination to the title of the true owner," <u>Downing</u>, 100 So. 2d at 64; <u>Seward</u>, 150 So. at 258, and "[a]ny doubts as to the creation of the right must be resolved in favor of the owner," <u>Downing</u>, 100 So. 2d at 65.

> 2.      Defendant's Argument that Tampa & Gulf Coast Adversely Possessed the Segments for a Seven-Year Period Beginning in 1915

Defendant first argues that Tampa & Gulf Coast adversely possessed the segments at issue because it "occupied the corridor under a claim of exclusive right for the statutory period by assuming possession, laying track and operating rail service.  It improved the corridor by laying track."  Def.'s Mot. 9.  Plaintiffs respond that defendant has not satisfied Florida's adverse possession requirements because it failed to show that the laying of tracks and the running of trains was adverse rather than permissive.  <u>See</u>

Pls.' Resp. 1-2.  Plaintiffs rely on the Florida presumption that "[a]ctual use is presumed to be rightful and in subordination to the title of the true owner." Id. at 2 (citing Crigger v. Fla. Power Corp., 436 So. 2d 937, 943 (Fla. Dist. Ct. App. 1983)).

Whether Tampa & Gulf Coast obtained title over the segments of land between the years 1915 and 1922, as defendant alleges, Def.'s Mot. 2, depends on Florida's adverse possession requirements applicable in 1915.  See Roth, 408 U.S. at 577 (observing that property interests are defined by state law rather than by the United States Constitution); Baugher, 58 So. at 982 (applying the seven-year statute of limitations in force at the time that the court determined that "actual occupancy and possession of the land by the defendant began").  The requirements are that the possession be (i) actual and exclusive, (ii) continuous for seven years, (iii) open and notorious, and (iv) adverse under a claim of title.  See Fla. Stat. Ann. § 1722 (West 1915); Downing, 100 So. 2d at 64.  Each adverse possession element must be proved by clear and convincing evidence, Seward, 150 So. at 258, and any doubt is to be resolved in favor of the owner of record, Downing, 100 So. 2d at 65.

     a.     Tampa & Gulf Coast Exercised Possession Over the Railroad Segments that was Actual, Exclusive and Continuous for Seven Years

Under Florida law, possession and occupation must be evidenced either by a substantial enclosure or land that has been "usually cultivated or improved."  Fla. Stat. Ann. § 1722 (West 1915).  The Supreme Court of Florida stated that reclaiming formerly submerged land, placing a portion of a house on it, putting dirt and planting trees on it, and keeping a wood pile there, could constitute sufficient evidence of "improvement." City of St. Petersburg v. Meloche (Meloche), 110 So. 341, 342 (Fla. 1926).  In support of this proposition, the Supreme Court of Florida cited with approval a case from the Supreme Court of Tennessee, see id., which held that paving a portion of land to make a plaintiff's store more accessible was evidence of improvement to the land, Bensdorff v. Uihlein, 177 S.W. 481, 483 (Tenn. 1915) ("[T]he placing of the pavement thereupon unmistakably indicated that some one [sic] was claiming the land, improving it, and asserting dominion over it.").  In addition, Florida law requires that an adverse possession claimant show that the possession or occupation was continuous, Horton v. Smith-Richardson Inv. Co., 87 So. 905, 908 (Fla. 1921) ("[A]ny break or interruption of the continuity of the possession will be fatal to the claim of the party setting up title by adverse possession . . . ."), and "exclusive of any other right," Fla. Stat. Ann. § 1722 (West 1915).

Tampa & Gulf Coast actually possessed the railroad segments at issue by laying down tracks and operating trains over those tracks.  Excerpted copies from volumes of

the <u>Poor's Manual</u>[6] provided by defendant for the years 1915 through 1922 establish that the Tampa & Gulf Coast rail line connecting Gulf Coast Junction and St. Petersburg--a line that included the segments at issue in this opinion--was completed as of June 30, 1915.  Defendant's Exhibit (DX)[7] 7 (<u>Poor's Manual 1916</u>), Dkt. No. 112-7, at 2 (identifying the rail lines owned by Tampa & Gulf Coast that had been completed by June 30, 1915 and listing as one of these the rail line connecting Gulf Coast Junction and St. Petersburg).  Defendant argues that these volumes of the <u>Poor's Manual</u>, which list the Gulf Coast Junction-St. Petersburg line as one among various rail lines that had been completed by Tampa & Gulf Coast for at least seven years from 1915 to 1922 and list the annual revenue generated by Tampa & Gulf Coast by all of its operations during this period, establish that Tampa & Gulf Coast actually laid tracks and actually and continually ran trains over those tracks.  <u>See</u> Def.'s Mot. 10-11.  Plaintiffs do not contest that Tampa & Gulf Coast laid tracks and operated trains over those tracks throughout this seven-year period.  <u>See</u> Pls.' Resp. 4 ("It is undisputed that no railroad used the property abutting the Abrams and Bama Sea . . . properties for anything other than laying tracks and operating trains.").  Although plaintiffs argue that the railroad merely "used" the corridor as a right-of-way and laid no greater claim to the land than for "an easement for railroad purposes," <u>id.</u>, this argument appears immaterial under Florida law.  Florida law supports the conclusion that laying tracks (if not also operating trains over those tracks), like paving, constitutes improvement to land and therefore actual occupation and possession.  <u>See</u> <u>Meloche</u>, 110 So. at 342 (citing <u>Bensdorff</u>, 177 S.W. at 483).

Tampa & Gulf Coast's possession was also continuous, that is, without any break or interruption, <u>Horton</u>, 87 So. at 908, and exclusive.  Florida courts have explained that a power line easement and a railroad right of way are distinct because "the construction of

---

[6]  A declaration, attached as an exhibit to defendant's motion for summary judgment, <u>see</u> <u>infra</u> n. 7, provided by Cindi A.R. Straup, the director of Axxion Administration, LLC, a company "retained to conduct title examination work" in this case, recounted her company's research strategies, Def.'s Ex. (DX) 1 (Straup Declaration), Dkt. No. 112-1, at 1.  Ms. Straup stated:

> We researched the "Manual of Railroads in the United States" that was published by
> Henry Poor and Company also referred to as "The Poor's Manual of Railroads"
> ("Manual")[.]  The Manual was first published in 1868 and updated annually through the
> 1920s.  The Manual provided a brief description and railroad status, equipment
> summaries, financial data and listing of company officers for each common carrier
> railroad in the United States.

<u>Id.</u> at 2.

[7]  Defendant attached eighteen exhibits in support of its motion for summary judgment.  When referring to these exhibits, the court refers to them by the docket number assigned by the court's electronic filing system, CM/ECF.

[a railroad's] road bed, the installation of its ties and tracks, and through its railroading operations, a railroad adversely using land excludes the owner from and prevents his use of that land, and so exercises dominion over it and has possession," whereas a power line tends to be suspended in the space above the land in a manner not inconsistent with various other uses by the record owner of the land below the power line. Fla. Power Corp. v. McNeely (McNeely), 125 So. 2d 311, 316-17 (Fla. Dist. Ct. App. 1960). As defendant points out, "The Poor's Manual entries for Tampa & Gulf [Coast] from 1917 through 1923 continue to report the Gulf Coast Junction to St. Petersburg line as a 'completed' rail line and summarize the revenue generated by rail service over the completed rail lines." Def.'s Mot. 11. Florida law supports the conclusion that Tampa & Gulf Coast's uses--laying down tracks and running trains over the segments--were exclusive of any other use of the land by the record owner, see McNeely, 125 So. 2d at 316-17, and the Poor's Manual shows that the railroad's use was "without break or interruption," that is, continuous, for the required seven years, see Horton, 87 So. at 908.

Because there is no genuine issue of material fact with respect to whether Tampa & Gulf Coast laid tracks and operated its trains over the disputed segments for the seven-year period in and between 1915 and 1922, see Pls.' Resp. 4; Def.'s Mot. 9-13, the court finds as a matter of law that Tampa & Gulf Coast actually, exclusively, and continuously occupied and possessed the two segments of the railroad corridor claimed by plaintiffs Abrams and Bama Sea for the seven years required under Florida law. See Fla. Stat. Ann. § 1722 (West 1915).

b.      Tampa & Gulf Coast's Possession Was Open and Notorious

Florida law regarding adverse possession also requires that possession "either be with the knowledge of the owner or so open, notorious, and visible that knowledge of the use by and adverse claim of the claimant is imputed to the owner." Downing, 100 So. 2d at 64; see also Douglass v. Aldridge, 105 So. 145, 146 (Fla. 1925); Watrous v. Morrison, 14 So. 805, 811 (Fla. 1894). Tampa & Gulf Coast's actions in and between 1915 and 1922 indicate that its possession of the disputed segments was open, notorious, and visible.

The parties do not dispute, see Pls.' Resp. 4; Def.'s Mot. 9-13, that Tampa & Gulf Coast, in and between 1915 and 1922, DX 7-14 (Poor's Manual 1916-1923), Dkt. Nos. 112-7 to 112-14, completed and used a rail line that encompassed the segments of the rail corridor at issue, which necessarily entailed constructing a road bed, installing ties and tracks, and, finally, running railroad cars over the tracks. See McNeely, 125 So. 2d at 316-17. Viewing the facts in the light most favorable to the non-moving party, here, plaintiffs, the laying of railroad tracks and the trains that ran over them appear under Florida law to be sufficiently "open, notorious, and visible" action such that knowledge of Tampa & Gulf Coast's use of the segments should be imputed to the owner. See

Hollywood, Inc. v. City of Hollywood, 321 So. 2d 65, 70 (Fla. 1975) (holding that the requirements of adverse user were satisfied where a city "openly and adversely occupied the beach by improving it, erecting showers, planting trees, posting city signs, providing life guards and routinely raking, grading and maintaining the beaches; the public has used the beaches daily; [and the city] has carried the property on its tax rolls as public beach"); Downing, 100 So. 2d at 64; Watrous, 14 So. at 811 (stating that "the possession . . . must, in its nature, possess such notoriety that the owner may be presumed to have notice of it and its extent).

        c.        A Genuine Issue of Material Fact Exists as to Whether Tampa & Gulf Coast's Possession Was Adverse and Under a Claim of Title

In order to prevail on an adverse possession claim under Florida law, a claimant must also show that the possession or occupation was adverse and under a claim of title. Downing, 100 So. 2d at 64. The burden is on the adverse possession claimant to overcome the Florida presumption that "the use or possession is presumed to be in subordination to the title of the true owner, and with his permission." Id.; see also Horton, 87 So. at 907 ("Every presumption is in favor of a possession in subordination to the title of the true owner, and an adverse possession as against such owner must be established by clear and positive proof."). Although proof of adversity does not require overt hostility, Crigger, 436 So. 2d at 944 n.16, a claimant must show possession or use absent the record owner's permission, cf. Bentz v. McDaniel, 872 So. 2d 978, 982 (Fla. Dist. Ct. App. 2004) (declining to find that plaintiffs, owners of a servient estate, extinguished an easement by adverse possession, noting, "There was no evidence of any trespass sign posted, no gate was erected across the entrance to the easement, and in fact, a 17 1/2 foot driveway opening was maintained. All structures or plantings placed in the 20 foot easement were undisputedly for the purpose of aesthetic enhancement and not as barriers."); Farley v. Hiers, 668 So. 2d 248, 250 (Fla. Dist. Ct. App. 1996) (finding sufficient evidence of adverse use of land on which a pump house was situated when "[t]he pump house was maintained continuously under lock and key").

Defendant argues that Tampa & Gulf Coast met the final element of Florida's adverse possession statute because it "occupied the corridor under a claim of exclusive right." Def.'s Mot. 9. As supporting evidence, defendant points to historical documents such as editions of the Poor's Manual that show that Tampa & Gulf Coast assumed possession of the corridor by "laying track and operating rail service" for seven years. Id.; see also DX 7-14 (Poor's Manual 1916-1923), Dkt. Nos. 112-7 to 112-14. Plaintiffs counter that defendant has not shown that the railroad's use of the land for its tracks and its rail service "was without the permission of [Abrams' and Bama Sea's] predecessors-in-interest." Pls.' Resp. 2.

Defendant points to no place in the record containing evidence to support the contention that Tampa & Gulf Coast's possession of the segments of the rail corridor claimed by plaintiffs Abrams and Bama Sea was adverse, that is, without the record owner's permission.  The evidence that defendant points to--the laying of tracks and the running of rail cars--could be the result of either an adverse action by the railroad or a permissive one.  Therefore, the court cannot say that defendant has met its initial burden to show that there is no genuine issue of material fact as to whether Tampa & Gulf Coast's possession was adverse, much less, adverse under a claim of title.  Cf. Gould v. Carr, 15 So. 259, 263 (Fla. 1894) ("The adverse claimant must keep his flag flying, and present a hostile front to adverse pretensions. . . .  It is something done by him, not merely that which is left undone by the owner, that is to be considered." (internal quotation marks and citations omitted)).  Defendant's motion for summary judgment that Tampa & Gulf Coast fulfilled Florida's adverse possession requirements in and between 1915 and 1922 is accordingly DENIED.

3.     Defendant's Argument in the Alternative Also Fails to Establish the Absence of a Genuine Issue of Material Fact with Respect to Adversity

Defendant argues in the alternative that the court should find that Tampa & Gulf Coast's successor, CSX Transportation, Inc. (CSX), Whispell I, 72 Fed. Cl. at 329 (stating that CSX is Tampa & Gulf Coast's successor), adversely possessed the segments during the "seven year period prior to the June 2004 NITU," Def.'s Mot. 3.  Plaintiffs again point out that "there is no evidence that the property owners did not permit the railroad [to] lay[] track and operat[e] trains over it."  Pls.' Resp. 2.

As discussed above in Part IV.A.1, adverse possession under Florida law requires possession that is actual and exclusive, open and notorious, continuous for seven years, and adverse under a claim of title.  Downing, 100 So. 2d at 64.  In addition, for adverse possession claimants whose claims of possession are alleged to have commenced after the 1939 amendments, Florida requires that such claimants file a return of property within one year after entering in possession and to pay any taxes assessed.  See 1939 Fla. Laws 495-96.  The Florida statute governing adverse possession without color of title in place in 1997 (seven years before the June 2004 NITU) states:

(1)  When the occupant or those under whom the occupant claims have been in actual continued occupation of real property for 7 years under a claim of title exclusive of any other right, but not founded on a written instrument, judgment, or decree, the property actually occupied shall be held adversely if the person claiming adverse possession made a return of the property by proper legal description to the property appraiser of the county where it is located within 1 year after entering into possession and has subsequently paid all taxes and matured installments of special

14

improvement liens levied against the property by the state, county, and municipality.

(2)  For the purpose of this section, property shall be deemed to be possessed in the following cases only:

(a)  When it has been protected by substantial enclosure.

(b)  When it has been usually cultivated or improved.

Fla. Stat. § 95.18 (1997).

The record shows, and plaintiffs do not contest, see Pls.' Resp. 4, that CSX operated rail cars over the segments for at least the seven years prior to the June 2004 NITU, see Surface Transportation Board Environmental Assessment, Dkt. No. 30-42, at 1-2.[8]  Because CSX maintained the tracks and operated trains over the segment at issue between 1997 and 2004, see id., the court finds as a matter of law that CSX possessed the segments of the railroad corridor at issue and that the possession was actual, exclusive, open, and continuous for seven years for the same reasons stated with regard to defendant's claim of adverse possession in and between 1915 and 1922, see Part IV.A.2.a-b.  However, defendant's alternative ground for summary judgment suffers the same defect as its primary argument:  defendant has failed to point to evidence in the record that would show that possession by CSX of the portion of the rail corridor at issue was adverse under a claim of title in and between 1997 and 2004.  See generally Def.'s Mot.; Part IV.A.2.c.

In addition, defendant has failed to offer clear and convincing evidence that CSX satisfied the post-1939 adverse possession requirements that it file a return of property within a year after assuming possession and that it pay the taxes assessed.  See Fla. Stat. § 95.18 (1997).  In support of its argument that CSX met the applicable adverse possession requirements, defendant provided the declaration of David Young, a manager of property taxes for CSX, containing the following statement:

> Each year, CSX[] submits an annual return statement to the State of Florida specifying the operating track mileage in the State of Florida.  Based on this annual return, the State of Florida assesses a value to this track mileage.  Once the valuation is assessed and agreed upon by CSX[], the State of Florida notifies the appropriate counties of the valuations and the counties

---

[8]  The Surface Transportation Board Environmental Assessment is attached as Exhibit OO, Dkt. No. 30-42, to Plaintiffs' Proposed Findings of Uncontroverted Fact, Dkt. No. 30.

> then invoice CSX[] for taxes on the track mileage in the county.  CSX[] then pays taxes directly to the county.

DX 16 (Young Decl.), Dkt. No. 112-16, at 1.  Mr. Young's declaration references, in general terms, an "annual return statement" that gave rise to assessment of taxes based on the railroad's track mileage.  Id.  It is unclear, however, if the "annual return statement" is equivalent to the return of property contemplated by § 95.18 of the Florida Statutes and, if not, when such a return may have been filed.  See Fla. Stat. § 95.18 (1997).  Nor does the declaration make clear the years in which the taxes were paid or whether the taxes paid were taxes on property claimed to be adversely possessed as distinguished from, for example, taxes on railroad operations or other railroad activities.  And defendant does not point to any place in the record where this information may be found.  Under Florida law, the failure to file a return of property or to pay the taxes assessed in accordance with Florida's adverse possession statute is fatal to a claim of adverse possession.  Id.; see also L.A.M.A. Land Mgmt., L.C. v. Ferro, 964 So. 2d 699, 701 (Fla. Dist. Ct. App. 2006); Van Meter, 91 So. 2d at 330.  Defendant's Motion requesting summary judgment on this alternate ground is DENIED.

B.    Reconsideration

Plaintiffs request that the court reconsider its opinion in Whispell III, arguing that none of the cases that the court relied upon "say a railroad acquires ownership of the fee estate in land used for only a right-of-way."  Pls.' Resp. 10.  Pursuant to RCFC 59(f), the court did not request responsive briefing to plaintiff's request.  See RCFC 59(f) (providing that "[a] response to any motion under [RCFC 59] may be filed only at the court's request and within the time specified by the court").  Accordingly, the court will not consider the arguments made by defendant in response to plaintiff's request for reconsideration.  See Def.'s Reply 4-6.

To prevail on a motion for reconsideration, "the moving party must show:  (1) the occurrence of an intervening change in the controlling law; (2) the availability of previously unavailable evidence; or (3) the necessity of allowing the motion to prevent manifest injustice."  Matthews v. United States, 73 Fed. Cl. 524, 526 (2006) (citing Griswold v. United States, 61 Fed. Cl. 458, 460-61 (2004), abrogated on other grounds by Holmes v. United States, 657 F.3d 1303, 1311-12 (Fed. Cir. 2011)).

Plaintiffs' briefing on their request for reconsideration repeats the legal arguments made in rounds of briefing in support of their prior cross-motion for partial summary judgment.  Compare Pls.' Supplemental Mem. in Supp. of Their Cross-Mot. for Partial Summ. J. Relating to Segments of Right-of-Way Referenced in Ordinance 429 and for Which There Is No Recorded Conveyance, Dkt. No. 68, at 11-23 (arguing that "[u]nder Florida law, the greatest interest a railroad may obtain in land by condemnation of a

right-of-way is an easement" and that three cases upon which the government relied do not support its argument that a railroad could obtain fee title by adverse possession), with Pls.' Resp. 10-13 (arguing the same).  Plaintiffs have pointed to no change in controlling law nor to previously unavailable evidence; nor have plaintiffs shown that the court's decision in Whispell III creates manifest injustice.  See generally Pls.' Resp.  The court declines to reconsider plaintiffs' arguments on the sole grounds that plaintiffs are dissatisfied with the court's prior rulings.  See Fru-Con, 44 Fed. Cl. at 300.  Accordingly, plaintiffs' request for reconsideration is DENIED.

V.    Conclusion

Based on the foregoing, the court DENIES defendant's Motion and DENIES plaintiff's request for reconsideration of Whispell III.

The parties shall, on or before Tuesday, September 18, 2012, propose further proceedings necessary to resolve what interest, if any, Tampa & Gulf Coast had in the segments of the railroad corridor claimed by plaintiffs Abrams and Bama Sea.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Chief Judge